E-FILED
Tuesday, 10 April, 2007 09:07:22 AM
Clerk, U.S. District Court, ILCD

RECEIVED
APR 0 5 2007
RICHARD MILLS
U.S. DISTRICT JUDGE
IN CHAMBERS
SPRINGFIELD, IL

Judge Richard Mills
151 U.S. District Courthouse
600 East Monroe St.
Springfield, Il. 62701

Dear Judge Mills;

I hope this letter finds you well. My name is Patrick O'Connor, and I'm writing to you today to respectfully request a written explaination or opinion of your decision to close case number 06 CV 3229 <u>O'CONNOR V. FIRKUS</u> on 2/15/07, a decision your clerk failed to inform me of until almost a month later. I realize you are an important and busy man, and I am just an unjustly convicted disabled American veteran, being held hostage under unconstitutional circumstances.

  Looking at my case from a wholistic view point, although I am not an attorney, I described in my complaint, an arrest, beating, prosecution, and conviction all in violation of the U.S. Constitution. When faced with this intolerable situation, it seems your duty is clear, "It is well settled that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." <u>JONES V. UNITED STATES</u> 463 U.S. 361, 103 S.Ct. 3043 quoting <u>ADDINGTON V. TEXAS</u> 441 U.S. 418, 425  99 S.Ct. 1804, <u>VITEK V. JONES</u> 445 U.S. 480, 492 100 S.Ct. 1254, 1263 moreover, "due process is flexible and calls for such procedural protections as the particular situation demands." <u>MORRSEY V. BREWER</u> 408 U.S. 471 92 S.Ct. 2593. Constitutionally required procedural protections are matters of federal law, and are analyzed through application of the <u>MATHEWS V. ELDRIDGE</u> 424 U.S. 319 96 S.Ct. 893 calculus." "State protections do not define what due process is under the 14th Amendment." <u>CLEVELAND V. BOARD OF EDUCATION OF LOUNDERMILL</u> 470 U.S. 532 105 S.Ct. 1487, "That is not to say that the state procedural protections are ignored. Rather once it is determined what process is due the individual, state procedures are scrutinized to see if they comport with the federal requirements." <u>SHANGO V. JURIC</u> 681 F2d 1091, 1098 7th Cir. (1982); scrutiny of 725 ILCS 5/109-3, 3.1 (see attached) clearly reveals a violation of the U.S. Supreme Court decisions in GERSTIEN and <u>RIVERSIDE V. MCLAUGHLIN</u> 500 U.S. 44, 111 S.Ct. 1661, 1667-8 which violates Article VI of the U.S. Constitution. After dismissing one of my motions for lack of a signature, please explain accepting the respondent's unsigned response. Will you please explain to me how with your personal knowledge of these facts, of which you opined have merit, being aware that at this time of war, your failure to act on Illinois rebellion to the Constitution, can be characterized as beneficial to our system of justice?

  I've heard it said that justice is blind, but for how long can you, an advocate of justice, turn a blind eye towards a rebellious state? You probably live in Illinois, but would you object if the police broke down your doors, and without

probable cause took your family members hostage? Of course you would, but why wait for Illinois' rebellion to grow worse? It has been 32 years since the U.S. Supreme Court decision in <u>GERSTIEN V. PUGH</u>, and 16 years since <u>RIVERSIDE V. MCLAUGHLIN</u> required judicial determinations of probable cause within 48 hours of arrest. Illinois refuses to abide by federal law, and defies you to do what is right starting with this case.

    Anyway, I'm requesting an opinion or explaination on which I can base my grounds for appeal of what I hope you now see as an erroneous decision. Thank you for your valuable time. Your help and cooperation in this matter is greatly appreciated. I look forward to your reply.

                                        Respectfully submitted,

*[signature: Pat O'Con]*

Patrick O'Connor
reg. no, B-45832
P.O. Box 1000
Lincoln, Il. 62656

P.S. I sent a copy of this communication to the attorney general, so as not to prejudice this court.

warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued. He shall be admitted to bail in the amount specified in the warrant or, for offenses other than felonies, in an amount as set by the judge, and such bail shall be conditioned on his appearing in the court issuing the warrant on a certain date. The judge may hold a hearing to determine if the defendant is the same person as named in the warrant.

(b) Notwithstanding the provisions of subsection (a), any person arrested in a county other than the one in which a warrant for his arrest was issued, may waive the right to be taken before a judge in the county where the arrest was made. If a person so arrested waives such right, the arresting agency shall surrender such person to a law enforcement agency of the county that issued the warrant without unnecessary delay. The provisions of Section 109–1 shall then apply to the person so arrested.

Laws 1963, p. 2836, § 109–2, eff. Jan. 1, 1964. Amended by P.A. 86–298, § 1, eff. Jan. 1, 1990.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 109–2.

### 5/109–3. Preliminary examination

§ 109–3. Preliminary examination. (a) The judge shall hold the defendant to answer to the court having jurisdiction of the offense if from the evidence it appears there is probable cause to believe an offense has been committed by the defendant, as provided in Section 109–3.1 of this Code, if the offense is a felony.

(b) If the defendant waives preliminary examination the judge shall hold him to answer and may, or on the demand of the prosecuting attorney shall, cause the witnesses for the State to be examined. After hearing the testimony if it appears that there is not probable cause to believe the defendant guilty of any offense the judge shall discharge him.

(c) During the examination of any witness or when the defendant is making a statement or testifying the judge may and on the request of the defendant or State shall exclude all other witnesses. He may also cause the witnesses to be kept separate and to be prevented from communicating with each other until all are examined.

(d) If the defendant is held to answer the judge may require any material witness for the State or defendant to enter into a written undertaking to appear at the trial, and may provide for the forfeiture of a sum certain in the event the witness does not appear at the trial. Any witness who refuses to execute a recognizance may be committed by the judge to the custody of the sheriff until trial or further order of the court having jurisdiction of the cause. Any witness who executes a recognizance and fails to comply with its terms shall, in addition to any forfeiture provided in the recognizance, be subject to the penalty provided in Section 32–10 of the "Criminal Code of 1961", approved July 28, 1961, as heretofore and hereafter amended,[1] for violation of bail bond.

(e) During preliminary hearing or examination the defendant may move for an order of suppression of evidence pursuant to Section 114–11 or 114–12 of this Act or for other reasons, and may move for dismissal of the charge pursuant to Section 114–1 of this Act or for other reasons.

Laws 1963, p. 2836, § 109–3, eff. Jan. 1, 1964. Amended by Laws 1967, p. 2833, § 1, eff. Aug. 11, 1967; P.A. 79–1360, § 26, eff. Oct. 1, 1976; P.A. 83–644, § 1, eff. Jan. 1, 1984.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 109–3.

[1] 720 ILCS 5/32–10.

### 5/109–3.1. Persons Charged with Felonies

§ 109–3.1. Persons Charged with Felonies. (a) In any case involving a person charged with a felony in this State, alleged to have been committed on or after January 1, 1984, the provisions of this Section shall apply.

(b) Every person in custody in this State for the alleged commission of a felony shall receive either a preliminary examination as provided in Section 109–3 or an indictment by Grand Jury as provided in Section 111–2, within 30 days from the date he or she was taken into custody. Every person on bail or recognizance for the alleged commission of a felony shall receive either a preliminary examination as provided in Section 109–3 or an indictment by Grand Jury as provided in Section 111–2, within 60 days from the date he or she was arrested.

The provisions of this paragraph shall not apply in the following situations:

(1) when delay is occasioned by the defendant; or

(2) when the defendant has been indicted by the Grand Jury on the felony offense for which he or she was initially taken into custody or on an offense arising from the same transaction or conduct of the defendant that was the basis for the felony offense or offenses initially charged; or

(3) when a competency examination is ordered by the court; or

(4) when a competency hearing is held; or

(5) when an adjudication of incompetency for trial has been made; or

(6) when the case has been continued by the court under Section 114–4 of this Code after a determination that the defendant is physically incompetent to stand trial.

(c) Delay occasioned by the defendant shall temporarily suspend, for the time of the delay, the period within which the preliminary examination must be held. On the day of expiration of the delay the period in question shall continue at the point at which it was suspended.

Laws 1963, p. 2386, § 109–3.1, added by P.A. 83–644, § 1, eff. Jan. 1, 1984.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 109–3.1.

## ARTICLE 110. BAIL

### 5/110–1. Definitions

§ 110–1. Definitions. (a) "Security" is that which is required to be pledged to insure the payment of bail.

(b) "Sureties" encompasses the monetary and nonmonetary requirements set by the court as conditions for release either before or after conviction. "Surety" is one who executes a bail bond and binds himself to pay the bail if the person in custody fails to comply with all conditions of the bail bond.

(c) The phrase "for which a sentence of imprisonment, without conditional and revocable release, shall be imposed by law as a consequence of conviction" means an offense for which a sentence of imprisonment, without probation, periodic imprisonment or conditional discharge, is required by law upon conviction.

would again be subject to the allegedly unconstitutional conduct—*i.e.*, a warrantless detention without a probable cause determination.

In light of the pending motion to dismiss, the District Court continued the hearing on the motion to certify the class. Various papers were submitted; then, in July 1988, the District Court accepted for filing a second amended complaint, which is the operative pleading here. From the record it appears that the District Court never explicitly ruled on defendants' motion to dismiss, but rather took it off the court's calendar in August 1988.

⌊₅The second amended complaint named three additional plaintiffs—Johnny E. James, Diana Ray Simon, and Michael Scott Hyde—individually and as class representatives. The amended complaint alleged that each of the named plaintiffs had been arrested without a warrant, had received neither a prompt probable cause nor a bail hearing, and was still in custody. 1 App. 3. In November 1988, the District Court certified a class comprising "all present and future prisoners in the Riverside County Jail including those pretrial detainees arrested without warrants and held in the Riverside County Jail from August 1, 1987 to the present, and all such future detainees who have been or may be denied prompt probable cause, bail or arraignment hearings." 1 App. 7.

In March 1989, plaintiffs asked the District Court to issue a preliminary injunction requiring the County to provide all persons arrested without a warrant a judicial determination of probable cause within 36 hours of arrest. 1 App. 21. The District Court issued the injunction, holding that the County's existing practice violated this Court's decision in *Gerstein*. Without discussion, the District Court adopted a rule that the County provide probable cause determinations within 36 hours of arrest, except in exigent circumstances. The court "retained jurisdiction indefinitely" to ensure that the County established new procedures that complied with the injunction. 2 App. 333–334.

The United States Court of Appeals for the Ninth Circuit consolidated this case with another challenging an identical preliminary injunction issued against the County of San Bernardino. See *McGregor v. County of San Bernardino*, decided with *McLaughlin v. County of Riverside*, 888 F.2d 1276 (1989).

On November 8, 1989, the Court of Appeals affirmed the order granting the preliminary injunction against Riverside County. One aspect of the injunction against San Bernardino County was reversed by the Court of Appeals; that determination is not before us.

⌊₆The Court of Appeals rejected Riverside County's *Lyons*-based standing argument, holding that the named plaintiffs had Article III standing to bring the class action for injunctive relief. 888 F.2d, at 1277. It reasoned that, at the time plaintiffs filed their complaint, they were in custody and suffering injury as a result of defendants' allegedly unconstitutional action. The court then proceeded to the merits and determined that the County's policy of providing probable cause determinations at arraignment within 48 hours was "not in accord with *Gerstein*'s requirement of a determination 'promptly after arrest'" because no more than 36 hours were needed "to complete the administrative steps incident to arrest." *Id.*, at 1278.

The Ninth Circuit thus joined the Fourth and Seventh Circuits in interpreting *Gerstein* as requiring a probable cause determination immediately following completion of the administrative procedures incident to arrest. *Llaguno v. Mingey*, 763 F.2d 1560, 1567–1568 (CA7 1985) (en banc); *Fisher v. Washington Metropolitan Area Transit Authority*, 690 F.2d 1133, 1139–1141 (CA4 1982). By contrast, the Second Circuit understands *Gerstein* to "stres[s] the need for flexibility" and to permit States to combine probable cause determinations with other pretrial proceedings. *Williams v. Ward*, 845 F.2d 374,

386 (1988), cert. denied, 488 U.S. 1020, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). We granted certiorari to resolve this conflict among the Circuits as to what constitutes a "prompt" probable cause determination under *Gerstein*.

## II

As an initial matter, the County renews its claim that plaintiffs lack standing. It explains that the main thrust of plaintiffs' suit is that they are entitled to "prompt" probable cause determinations and insists that this is, by definition, a time-limited violation. Once sufficient time has passed, the County argues, the constitutional violation is complete because a probable cause determination made after that point ⌊₇would no longer be "prompt." Thus, at least as to the named plaintiffs, there is no standing because it is too late for them to receive a prompt hearing and, under *Lyons*, they cannot show that they are likely to be subjected again to the unconstitutional conduct.

[1, 2] We reject the County's argument. At the core of the standing doctrine is the requirement that a plaintiff "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The County does not dispute that, at the time the second amended complaint was filed, plaintiffs James, Simon, and Hyde had been arrested without warrants and were being held in custody without having received a probable cause determination, promptly or otherwise. Plaintiffs alleged in their complaint that they were suffering a direct and current injury as a result of this detention, and would continue to suffer that injury until they received the probable cause determination to which they were entitled. Plainly, plaintiffs' injury was at that moment capable of being redressed through injunctive relief. The County's argument that the constitutional violation had already been "completed" relies on a crabbed reading of the complaint. This case is easily distinguished from *Lyons*, in which the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint.

[3] It is true, of course, that the claims of the named plaintiffs have since been rendered moot; eventually, they either received probable cause determinations or were released. Our cases leave no doubt, however, that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review. In factually similar cases we have held that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." See, *e.g.*, ⌊₈*Gerstein*, 420 U.S., at 110–111, n. 11, 95 S.Ct., at 861, n. 11, citing *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Schall v. Martin*, 467 U.S. 253, 256, n. 3, 104 S.Ct. 2403, 2405, n. 3, 81 L.Ed.2d 207 (1984). That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction. We recognized in *Gerstein* that "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479 (1980), citing *Gerstein*, *supra*, 420 U.S., at 110, n. 11, 95 S.Ct., at 861, n. 11. In such cases, the "relation back" doctrine is properly invoked to preserve the merits of the case for judicial resolution. See *Swisher v. Brady*, 438 U.S. 204, 213–214, n. 11, 98 S.Ct. 2699, 2705 n. 11, 57 L.Ed.2d 705 (1978); *Sosna*, *supra*, 419 U.S., at 402, n. 11, 95 S.Ct., at 559, n. 11. Accordingly, we proceed to the merits.

## III

### A

In *Gerstein*, this Court held unconstitutional Florida procedures under which per-

sons arrested without a warrant could remain in police custody for 30 days or more without a judicial determination of probable cause. In reaching this conclusion we attempted to reconcile important competing interests. On the one hand, States have a strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial determination of probable cause. 420 U.S., at 112, 95 S.Ct., at 862. On the other hand, prolonged detention based on incorrect or unfounded suspicion may unjustly "imperil [a] suspect's job, interrupt his source of income, and impair his family relationships." Id., at 114, 95 S.Ct., at 863. We sought to balance these competing concerns by holding that States "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or *promptly after* arrest." Id., at 125, 95 S.Ct., at 868–869 (emphasis added).

[4] The Court thus established a "practical compromise" between the rights of individuals and the realities of law enforcement. Id., at 113, 95 S.Ct., at 863. Under Gerstein, warrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause. Id., at 114, 95 S.Ct., at 863. Significantly, the Court stopped short of holding that jurisdictions were constitutionally compelled to provide a probable cause hearing immediately upon taking a suspect into custody and completing booking procedures. We acknowledged the burden that proliferation of pretrial proceedings places on the criminal justice system and recognized that those persons who are arrested, might be disserved by introducing further procedural complexity into an already intricate system. Id., at 119–123, 95 S.Ct., at 865–868. Accordingly, we left it to the individual States to integrate prompt probable cause determinations into their differing systems of pretrial procedures. Id., at 123–124, 95 S.Ct., at 867–868.

[5] In so doing, we gave proper deference to the demands of federalism. We recognized that "state systems of criminal procedure vary widely" in the nature and number of pretrial procedures they provide, and we noted that there is no single "preferred" approach. Id., at 123, 95 S.Ct., at 868. We explained further that "flexibility and experimentation by the States" with respect to integrating probable cause determinations was desirable and that each State should settle upon an approach "to accord with [the] State's pretrial procedure viewed as a whole." Ibid. Our purpose in Gerstein was to make clear that the Fourth Amendment requires every State to provide prompt determinations of probable cause, but that the Constitution does not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways.

[6] Inherent in Gerstein's invitation to the States to experiment and adapt was the recognition that the Fourth Amendment does not compel an immediate determination of probable cause upon completing the administrative steps incident to arrest. Plainly, if a probable cause hearing is constitutionally compelled the moment a suspect is finished being "booked," there is no room whatsoever for "flexibility and experimentation by the States." Ibid. Incorporating probable cause determinations "into the procedure for setting bail or fixing other conditions of pretrial release"—which Gerstein explicitly contemplated, id., at 124, 95 S.Ct., at 868—would be impossible. Waiting even a few hours so that a bail hearing or arraignment could take place at the same time as the probable cause determination would amount to a constitutional violation. Clearly, Gerstein is not that inflexible.

Notwithstanding Gerstein's discussion of flexibility, the Court of Appeals for the Ninth Circuit held that no flexibility was permitted. It construed Gerstein as "requir[ing] a probable cause determination to be made *as soon as the administrative steps incident to arrest were completed*, and that such steps should require only a brief period." 888 F.2d, at 1278 (emphasis added) (internal quotation marks omitted). This same reading is advanced by the dissents. See *post*, at 1671–1673, 1674 (opinion of MARSHALL, J.); *post*, at 1672 (opinion of SCALIA, J.). The foregoing discussion readily demonstrates the error of this approach. Gerstein held that probable cause determinations must be prompt—not immediate. The Court explained that "flexibility and experimentation" were "desirable"; that "[t]here is no single preferred pretrial procedure"; and that "the nature of the probable cause determination usually will be shaped to accord with a State's pretrial procedure viewed as a whole." 420 U.S., at 123, 95 S.Ct., at 868. The Court of Appeals and Justice SCALIA disregard these statements, relying instead on selective quotations from the Court's opinion. As we have explained, *Gerstein* struck a balance between competing interests; a proper understanding of the decision is possible only if one takes into account both sides of the equation.

Justice SCALIA claims to find support for his approach in the common law. He points to several statements from the early 1800's to the effect that an arresting officer must bring a person arrested without a warrant before a judicial officer " *as soon as he reasonably can*." Post, at 1672 (emphasis in original). This vague admonition offers no more support for the dissent's inflexible standard than does Gerstein's statement that a hearing follow "promptly after arrest." 420 U.S., at 125, 95 S.Ct., at 869. As mentioned at the outset, the question before us today is what is "prompt" under *Gerstein*. We answer that question by recognizing that *Gerstein* struck a balance between competing interests.

### B

Given that *Gerstein* permits jurisdictions to incorporate probable cause determinations into other pretrial procedures, some delays are inevitable. For example, where, as in Riverside County, the probable cause determination is combined with arraignment, there will be delays caused by paperwork and logistical problems. Records will have to be reviewed, charging documents drafted, appearance of counsel arranged, and appropriate bail determined. On weekends, when the number of arrests is often higher and available resources tend to be limited, arraignments may get pushed back even further. In our view, the Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing suspects through an overly burdened criminal justice system.

But flexibility has its limits; *Gerstein* is not a blank check. A State has no legitimate interest in detaining for extended periods individuals who have been arrested without probable cause. The Court recognized in *Gerstein* that a person arrested without a warrant is entitled to a fair and reliable determination of probable cause and that this determination must be made promptly.

Unfortunately, as lower court decisions applying *Gerstein* have demonstrated, it is not enough to say that probable cause determinations must be "prompt." This vague standard simply has not provided sufficient guidance. Instead, it has led to a flurry of systemic challenges to city and county practices, putting federal judges in the role of making legislative judgments and overseeing local jailhouse operations. See, *e.g., McGregor v. County of San Bernardino*, decided with *McLaughlin v. County of Riverside*, 888 F.2d 1276 (CA9 1989); *Scott v. Gates*, Civ. No. 84–8647 (CD Cal, Oct. 3, 1988); see also *Bernard v. Palo Alto*, 699 F.2d 1023 (CA9 1983); *Sanders v. Houston*, 543 F.Supp. 694 (SD Tex.1982), aff'd, 741 F.2d 1379 (CA5

## CONSTITUTION OF THE UNITED STATES

point Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

[...section 3...]

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

[Section 4.] The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

### Article III.

[Section 1.] The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

[Section 2.] The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.[7]

[...affected by the Eleventh Amendment.]

[In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.]

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Section. 3. Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

### Article IV.

Section. 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Section. 2. The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.[8]

[8] This clause was affected by the Thirteenth Amendment.

Section. 3. New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Section. 4. The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

### Article V.

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first

---

Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

### Article VI.

All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

### Article VII.

The Ratification of the Conventions of nine States, shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

Done in Convention by the Unanimous Consent of the States present the Seventeenth Day of September in the Year of Our Lord one thousand seven hundred and Eighty seven and of the Independence of the United States of America the Twelfth. In Witness whereof We have hereunto subscribed our Names.

Go. WASHINGTON—*Presidt.*
*and deputy from Virginia*

Attest WILLIAM JACKSON *Secretary*

*New Hampshire*
JOHN LANGDON    NICHOLAS GILMAN

*Massachusetts*
NATHANIEL GORHAM    RUFUS KING

*Connecticut*
WM. SAML. JOHNSON    ROGER SHERMAN

*New York*
ALEXANDER HAMILTON

*New Jersey*
WIL. LIVINGSTON    WM. PATERSON.
DAVID BREARLEY.    JONA. DAYTON

*Pennsylvania*
B FRANKLIN    THOS. FITZSIMONS
THOMAS MIFFLIN    JARED INGERSOLL
ROBT MORRIS    JAMES WILSON
GEO. CLYMER    GOUV MORRIS

*Delaware*
GEO: READ    RICHARD BASSETT
GUNNING BEDFORD jun    JACO: BROOM
JOHN DICKINSON

*Maryland*
JAMES MCHENRY    DANL. CARROLL
DAN OF ST THOS. JENIFER

*Virginia*
JOHN BLAIR—    JAMES MADISON JR.

*North Carolina*
WM. BLOUNT    HU WILLIAMSON
RICHD. DOBBS SPAIGHT

*South Carolina*
J. RUTLEDGE    CHARLES PINCKNEY
CHARLES COTESWORTH PINCKNEY    PIERCE BUTLER

*Georgia*
WILLIAM FEW    ABR BALDWIN

### Historical Notes

**Proposal and Ratification of Original Articles**

In May, 1785, a committee of Congress made a report recommending an alteration in the Articles of Confederation, but no action was taken on it, and it was left to the State Legislatures to proceed in the matter. In January, 1786, the Legislature of Virginia passed a resolution providing for the appointment of five commissioners, who, or any three of them, should meet such commissioners as might be appointed by the other States of the Union, at a time and place to be agreed upon, to take into consideration the trade of the United States; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony, and to report to the several States such an act, relative to this great object, as, when ratified by them, will enable the United States in Congress effectually to provide for the same. The Virginia commissioners, after some correspondence, fixed the first Monday in September as the time, and the city of Annapolis as the place for the meeting, but only four other States were represented, viz.: Delaware, New York, New Jersey, and Pennsylvania; the commissioners appointed by Massachusetts, New Hampshire, North Carolina, and Rhode Island failed to attend. Under the circumstances of so partial a representation, the commissioners present agreed upon a report, (drawn by Mr. Hamilton, of New York,) expressing their unanimous conviction that it might essentially tend to advance the interests of the Union if the States by which they were respectively delegated would concur, and use their endeavors to procure the concurrence of the other States, in the appointment of commissioners to meet at Philadelphia on the second Monday of May following, to take into consideration the situation of the United States; to devise such further provisions as should appear to them necessary to render the Constitution of the Federal Government adequate to the exigencies of the Union, and to report such an act for that purpose to the United States in Congress assembled as, when agreed to by them, and afterwards confirmed by the Legislatures of every State, would effectually provide for the same.

Congress, on the 21st of February, 1787, adopted a resolution in favor of a convention, and the Legislatures of those States which had not already done so (with the exception of Rhode Island) promptly appointed delegates. On the 25th of May, seven States having convened, George Washington, of Virginia, was unanimously elected President, and the consideration of the proposed constitution was commenced. On the 17th of September, 1787, the Constitution as engrossed and agreed upon was signed by all the members present, except Mr. Gerry, of Massachusetts, and Messrs. Mason and Randolph, of Virginia. The president of the convention transmitted it to Congress, with a resolution stating how the proposed Federal Government should be put in operation, and an explanatory letter. Congress, on the 28th of September, 1787, directed the Constitution so framed, with the resolutions and letter concerning the same, to "be transmitted to the several Legislatures in order to be submitted to a convention of delegates chosen in each State by the people thereof, in conformity to the resolves of the convention."

On the 4th of March, 1789, the day which had been fixed for commencing the operations of Government under the new Constitution, it had been ratified by the conventions chosen in each State to consider it, as follows: Delaware, December 7, 1787; Pennsylvania, December 12, 1787; New Jersey, December 18, 1787; Georgia, January 2, 1788; Connecticut, January 9, 1788; Massachusetts, February 6, 1788; Maryland, April 28, 1788; South Carolina, May 23, 1788; New Hampshire, June 21, 1788; Virginia, June 26, 1788; and New York, July 26, 1788.

The President informed Congress, on the 28th of January, 1790, that North Carolina had ratified the Constitution November 21, 1789; and he informed Congress on the 1st of June, 1790, that Rhode Island had ratified the Constitution May 29, 1790. Vermont, in convention, ratified the Constitution January 10, 1791, and was on March 4, 1791, by an act of Congress approved February 18, 1791, "received and admitted into this Union as a new and entire member of the United States."

**Articles in Addition to, and Amendment of, the Constitution of the United States of America, Proposed by Congress, and Ratified by the Legislatures of the Several States Pursuant to the Fifth Article of the Original Constitution**

Patrick Counoil B-48732
Logan Correctional Center
P.O. Box 1000
Lincoln, IL 62656

THIS CORRESPONDENCE IS FROM
AN INMATE OF THE ILLINOIS
DEPARTMENT OF CORRECTIONS

THIS ENVELOPE IS RECYCLABLE AND MADE
WITH 30% POST CONSUMER CONTENT.

Judge Michael M. Mihm
U.S. District Court
U.S. Courthouse
600 East Monroe St
Springfield, IL 62701


UNITED STATES POSTAGE
$00.240
APR 03 2007
MAILED FROM ZIPCODE 62656
PITNEY BOWES

